IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

OKEVLIBUS THORNTON,
TIMOTHY STEPHENS, TROY
STEPHENS, and DEVORIOUS
MONTEZ WOODEN JONES,

　　　　　　Defendants.

CRIMINAL CASE NO.

1:10-CR-0453-ODE-JFK

## REPORT AND RECOMMENDATION

Pending before the court are Defendant Troy Stephens' motion [Doc. 48] to suppress evidence and Defendant Timothy Stephens' motion [Doc. 49] to suppress evidence.  An evidentiary hearing was held on the motions on April 5, 2011.[1]  [Doc. 92].  In his post-hearing brief, Defendant Troy Stephens contends that, because the agents arresting him unlawfully entered the hotel room in which he was staying, their observations of evidence therein, which provided a basis for probable cause to obtain a search warrant for the hotel room, also tainted the search warrant and any evidence seized as a result of execution of the warrant must be suppressed as fruit of the

---

[1]Citations to the evidentiary hearing are:  (Tr. at ).

poisonous tree.  [Doc. 100].  Defendant Timothy Stephens likewise challenges the

evidence seized as a result of execution of the search warrant, and additionally

contends that even if Troy Stephens consented to a search of the room, he lacked

authority to do so, therefore, the consent was not valid.  [Doc. 99].  The Government

responds opposing the motions to suppress.  [Docs. 106 and 107].  The Government

initially notes that, although placed on notice that the Government contends that

Timothy Stephens lacked a reasonable expectation of privacy in the hotel room,

Defendant failed to address that issue at all in his post-hearing brief and, thereby,

contends that he lacks the necessary Fourth Amendment interest to challenge the

search of the room.  [Doc. 106 at 9-11].  And, as to both motions to suppress, the

Government further argues that Troy Stephens, who did have authority, voluntarily

consented to the agents' entry into the hotel room to search for Timothy Stephens and

that, while lawfully in the room, the agents observed in plain view evidence supporting

probable cause for the search warrant.  Therefore, the evidence seized as a result of

execution of the search warrant is admissible in evidence.  [Docs. 106 at 11-16; 107

at 6-11].

2

After consideration of the argument of the parties, relevant legal authority and the totality of the circumstances surrounding the search of the hotel room, the court recommends denying the Defendants' motions to suppress.

## I.      Facts

In late October 2010, Federal Bureau of Investigation ("FBI") agents located in the Norfolk, Virginia, office received information from agents in the Atlanta FBI office concerning arrest warrants for Troy and Timothy Stephens, brothers, which had been issued in connection with an armored car robbery.  (Tr. at 5-6, 51-52).  The information from FBI agents in Atlanta indicated that the men were in the Norfolk area and that, on October 28, 2010, Troy Stephens had been tracked to the Stay Bridge Suites, 709 Woodlake Drive, Chesapeake, Virginia, room 227.  (Tr. at 6-7, 35, 53). The agents had tracked Troy Stephens to the room based on his use of a cellular telephone.  (Tr. at 7, 31-33).

FBI agents arrived at the hotel around 5:00 p.m., on October 28, 2010, and Special Agents Wendell Cosenza, Scott Spiegel-Halter and Jason Grabarczyk, members of FBI SWAT, conducted surveillance on the second floor where they could observe the door to room 227.  (Tr. at 7-8, 51-53).  The agents were dressed in plain clothes, and although armed and possessing handcuffs and a radio, the weapons and

AO 72A
(Rev.8/82)

other items were not visible.  They were not identifiable as law enforcement officers.  (Tr. at 9-10, 36, 53-54).  After approximately thirty to forty minutes, the agents observed a black male, using a cellular telephone, exit from room 227.  He turned away from the agents' location heading down the hall towards the elevators.  The agents had not seen anyone else either exit or enter the room.  (Tr. at 10, 14, 16, 33-34, 36, 54).  The agents followed him.  (Tr. at 10, 55).  Based on photographs that the agents had of the Stephenses, they believed the black male to be one of the Defendants, Troy.  (Tr. at 53).

As the agents passed by room 227, they heard noise or music coming from the room, and Agent Cosenza remained outside the room while Agents Spiegel-Halter and Grabarczyk continued to the follow the black male.  (Tr. at 10, 34, 55).  At the end of the hall, the black male made a left turn, going past the elevators to stand by a window as he continued his telephone conversation.  (Tr. at 10, 36, 55).  The agents stood at the elevators as if waiting for one to arrive.  (Tr. at 37, 55).  When the black male completed his conversation, one of the agents, said, "Troy?" or asked him if he was Troy.  (Tr. at 55, 67).  Defendant Troy Stephens turned around in response, and the agents, after identifying themselves, placed him in custody and handcuffed Defendant.  (Tr. at 55).  Defendant did not struggle, and no physical force was used to place

4

Defendant under arrest.  The agents did not draw their firearms.  (Tr. at 57-58).  The agents did not raise their voices.  (Tr. at 57).  Defendant was placed under arrest within a few minutes of exiting the hotel room.  (Tr. at 15, 37, 58).

The agents, each holding one of Defendant's arms, escorted Defendant back down the hall to where Agent Cosenza was waiting outside room 227.  (Tr. at 15, 38, 55, 58).  Agent Cosenza asked Defendant Troy Stephens if anyone else was in the room,[2] and he responded, "No, and that we could check."  (Tr. at 16, 38, 59, 65).  The agent understood that, although the word "consent" was not used, Defendant gave the agents consent to enter the room to look for other occupants.[3]  (Tr. at 38-39).  When the agent asked if Defendant had a key, Defendant indicated that the key was in his back pocket.  (Tr. at 16, 39, 59).  Agent Grabarczyk retrieved the key card from Defendant's back pocket and handed the key to Agent Cosenza, who used it to open

---

[2]The agents testified that they asked Troy Stephens if anyone else was in the room because they had information from the agents in Atlanta that Timothy Stephens was with his brother and because they had heard noise and music coming from the room after Troy Stephens exited the room.  (Tr. at 5, 18-19, 35, 53, 67).  The agents did not have any specific details as to why Atlanta agents thought the men were together.  (Tr. at 35, 41).

[3]Agent Cosenza said that they did not knock on the door or make a call to the room or ask a manager to open the door and go inside to see if anyone else was in the room.  (Tr. at 38-39).

the door to room 227.  (Tr. at 16, 59).  During the time of this conversation, the agents did not have their weapons drawn, did not threaten Defendant nor make him any promises and did not raise their voices.  No physical force was used by the agents.  (Tr. at 14-15, 17-18, 60).  Defendant appeared to understand the agents and appeared alert and coherent, not under the influence of either drugs or alcohol.  (Tr. at 18, 60).  At no time did Defendant make any statements indicating that the agents could not enter the room.  (Tr. at 18, 61).

While Agent Spiegel-Halter remained in the hallway with Troy Stephens, Agents Cosenza and Grabarczyk entered to "clear" room 227 to be sure no one else was inside.  Their firearms were drawn for safety.  (Tr. at 16, 40, 59).  As they entered, the agents called out, "FBI, you need to come out . . ." and continued to make this announcement as they walked through the room.  (Tr. at 61).  In the room, to the agents' right, there was a kitchenette area with an island and to their left was a table.[4] (Tr. at 16, 20).  In the main room, there was a couch and a television.  (Tr. at 17).  The agents stood and looked around, including behind the couch, to be sure no one was hiding.  (Tr. at 20).  On the island, the agents observed a baseball cap that was turned

---

[4]A rough diagram of the room was introduced into evidence.  (Tr. at 20; Gov't Ex. 3).

upside down and, in the cap, was a large amount of U.S. currency.  The agents did not

touch the currency.  (Tr. at 21, 47, 62, 66).  The agents had been advised that $500,000

to $600,000 in U.S. currency was missing from the armored car robbery.  (Tr. at 19).

On the table, they observed some clear bags containing a green leafy substance which

the agents, based on their training and experience, believed to be marijuana.  (Tr. at 21,

62).  Agent Cosenza stated that he had detected the odor of marijuana in the room.  (Tr.

at 21-22).

     The agents then moved into the bedroom and bathroom area where they

continued to look for anyone in the room, including beside and under the bed.  (Tr. at

17, 21, 61).  They did not see anyone else in any of the areas in room 227.  (Tr. at 17).

Throughout the various parts of room 227, the agents observed numerous brand new

items, such as stacks of hats, clothes, movies, and x-boxes, which had apparently just

been purchased.  (Tr. at 62).  The agents then returned to the area just inside the door

to room 227.  (Tr. at 17, 21-22, 61).  The sweep of the room lasted less than a minute.

(Tr. at 17, 61).  The room was not searched any further.  (Tr. at 23, 63).  At this point,

Agent Spiegel-Halter and Troy Stephens stepped into the room, remaining just inside

the doorway.  (Tr. at 17, 40).  And Defendant was patted down incident to arrest and

in order to be transported to Marshal's lock-up.  The agents removed his belt, two

cellular telephones and a small amount of cash.  (Tr. at 23, 62).  These items were placed on the kitchenette island.  (Tr. at 23, 63).  The agents also contacted their supervisor to report what had occurred and their observations in room 227, which were used to obtain a search warrant.  (Tr. at 22, 40).

While a search warrant for the room was being secured, Agent Cosenza transported Defendant Troy Stephens to lock-up, and Agents Spiegel-Halter and Grabarczyk remained just inside the door of room 227, with the door propped open, in order to secure the room.  (Tr. at 24, 64).  No additional search of the room occurred. (Tr. at 63).  The search warrant was obtained, and the warrant executed on room 227 resulting in the seizure of items of evidentiary value.  (Tr. at 24, 40) [Doc. 100, Ex. 1, 2 and 3].

On October 30, 2010, Defendant Timothy Stephens was arrested approximately twenty miles from the Stay Bridge Suites hotel, in the vicinity of Virginia Beach.  (Tr. at 25).  The agents initially had information that he was located at a Hampton Inn in Norfolk, then located him in Virginia Beach.  (Tr. at 25).  He was arrested on the Atlanta FBI warrant while riding in a green mini-van driven by an individual, Jamie Moses, later determined to be his step-father, and with another passenger, Devorious

Jones.  (Tr. at 26, 28).  Agent Cosenza questioned Jones about his and Timothy Stephens' activities since the armored car robbery.  (Tr. at 27).

Jones advised that after the robbery, he, Troy and Timothy Stephens drove from Atlanta to Virginia where they stayed for a couple of weeks in a Holiday Inn near Military Circle.  (Tr. at 27).  Jones had contact with his mother and step-father, Moses.  (Tr. at 28).  After the men were robbed at the Holiday Inn, all three moved to the Stay Bridge Suites.[5]  (Tr. at 29).  Timothy Stephens and Jones stayed a few nights before the two men flew back to Atlanta, where they stayed for a few nights, before returning

---

[5]A young woman, Brittney Montgomery, who was introduced to Timothy Stephens and Jones through a third person, filled out the paperwork for the rental of room 227; however, she was not involved in handling any of the funds used to pay for the rental.  (Tr. at 76-78, 81, 85; Def. Ex. 1).  She stayed in the room the first night it was rented and then visited at the room a couple of more times before she was informed that Timothy Stephens and Jones were returning to Atlanta, sometime late in October 2010.  The men advised that they would be returning.  (Tr. at 78, 80-81, 87).  She was not sure for how long the room was being rented.  (Tr. at 79).  She did not go back to the Stay Bridge Suites.  (Tr. at 88).  In late October, agents with the FBI contacted her and advised her that someone was arrested at the Stay Bridge Suites, and at their request, she contacted Timothy Stephens, who advised that he was at the Hampton Inn.  (Tr. at 82-83, 86, 88).  She did not recall meeting Troy Stephens.  (Tr. at 77).  Agent Cosenza testified that, although he was not sure when he found out about Ms. Montgomery's involvement with room 227, at some point, he learned that the room was rented in her name on October 19, 2010, and that the rental expired on October 28 or 29, 2010.  (Tr. at 24-25, 33, 44-45).

9

to Virginia on a Greyhound bus on October 29, 2010.[6]  (Tr. at 28-29, 48).  The men checked into the Red Roof Inn when they returned, then moved into the Hampton Inn, as the agents had been informed.  (Tr. at 28).  When the men arrived in Virginia, they tried to contact Troy Stephens on his cellular telephone but received no response. They then contacted the Stay Bridge Suites and were advised that no one was in the room, but they did not go back to the hotel.  (Tr. at 29-30, 48).  Timothy Stephens' girlfriend, Tara Lashaun Smith, of over four years also testified about her contact with Timothy Stephens in October of 2010.  (Tr. at 69).  She stated that Timothy Stephens had left town in October, advising her, that he was going to work.  He did not say where he was going.  (Tr. at 73).  He returned and spent October 28, 2010, her birthday, with her in Atlanta.  (Tr. at 70, 72, 74).  She understood that he had been in town the night before.  (Tr. at 71).  Very early on the morning of October 29, as he requested, she dropped Timothy Stephens off at the Greyhound bus station.  He advised her that he had to go check on his brother, but he did not say where he was going or provide any other details.  (Tr. at 72, 74).

---

[6]When Timothy Stephens and Jones left to go back to Atlanta, Troy Stephens remained at the Stay Bridge Suites.  (Tr. at 48).

10

Additional facts will be set forth as necessary in the discussion of Defendants' motions to suppress.

## II.    Discussion

The first issue for the court to address is whether Defendant Timothy Stephens had a reasonable expectation of privacy in room 227 of the Stay Bridge Suites on October 28, 2010, the date of the search in this case.  If not, then he cannot challenge either the initial entry into the room nor the subsequent search pursuant to the search warrant.  The Government does not contend that Defendant Troy Stephens lacked a reasonable expectation of privacy in the room on the date of the search.  Assuming, both Defendants can challenge the entry into the room and the subsequent search, Defendants contend that Defendant Troy Stephens did not consent to the initial entry and sweep for other persons.  As a part of that challenge, Defendant Troy Stephens asserts that the agents' actions exceeded the scope of any consent he may have given, and Defendant Timothy Stephens asserts that Defendant Troy Stephens did not have authority to consent to the entry into the room.  Neither Defendant argues that, if the entry and sweep were lawful based on consent, the agents did not observe the currency, marijuana, and various newly purchased items in plain view in the room.  Finally, the

11

only challenge made by Defendants to the search warrant is based on alleged taint if the initial entry and sweep were unlawful.  [Docs. 99 and 100].

> a.    **Expectation of Privacy**

To determine whether an individual may challenge a search, the court must decide "whether the individual maintains a legitimate expectation of privacy in the object of the search."  United States v. Hastamorir, 881 F.2d 1551, 1559 (11th Cir. 1989).  It is Defendant Timothy Stephens' burden to prove that he has a legitimate expectation of privacy in the object of the search, Stay Bridge Suites room 227, on October 28, 2010.  See United States v. Cooper, 203 F.3d 1279, 1283-84 (11th Cir. 2000).  Making this determination involves a two-part inquiry:  (1) "whether the individual has manifested 'a subjective expectation of privacy in the object of the challenged search[,]' . . . [and (2)] whether society is willing to recognize the individual's expectation of privacy as legitimate."  Hastamorir, 881 F.2d at 1559 (citation omitted).  In this regard, "[t]he Supreme Court has held that '[a] person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed.'"  United States v. Brown, 743 F.2d 1505, 1506 (11th Cir. 1984) (quoting Rakas v. Illinois, 99 S. Ct. 421, 425 (1978)).  Thus, "'in

12

order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable. . . .'" United States v. Chaves, 169 F.3d 687, 690 (11th Cir. 1999) (citation omitted). In other words, "Fourth Amendment rights are personal and may not be vicariously asserted." Lenz v. Winburn, 51 F.3d 1540, 1549 (11th Cir. 1995). Defendant cannot assert the rights of anyone else in seeking suppression of the evidence obtained from room 227 and must demonstrate that he personally had a reasonable expectation of privacy in the room on October 28, 2010. As the Government notes in its post-hearing brief, despite being aware that his right to challenge the search was in dispute, Defendant Timothy Stephens did not present any facts from the evidentiary hearing or make any argument in support of finding that he had a legitimate expectation of privacy. [Doc. 106 at 9-10]. The court agrees that Defendant did not have a legitimate expectation of privacy in room 227 on October 28, 2010.

First, an individual can have a legitimate expectation of privacy in a hotel room just the same as a person can have in a residence. See United States v. Ramos, 12 F.3d 1019, 1023 (11th Cir. 1994) ("Use of a motel room for lodging provides the same expectation of privacy as does a home."); United States v. Forker, 928 F.2d 365, 370

(11th Cir. 1991) (same).  And the facts establish that at least until October 26-27, 2010, when Defendant Timothy Stephens and Jones left Virginia to return to Atlanta, Defendant had a reasonable expectation of privacy in the room.  Although the room was neither rented in his name nor is there any evidence that he paid for the rental of the room (Tr. at 78-81; Def. Ex. 1), he evidently resided in that room with his brother and Jones from October 19, 2010, until he left to go back to Atlanta (Tr. at 29, 80). See United States v. Kimoana, 383 F.3d 1215, 1221 (10th Cir. 2004) ("Overnight guest and joint occupants of motel rooms possess reasonable expectations of privacy in the property on which they are staying.").  However, "[l]egitimate expectations of privacy can be abandoned." United States v. McKennon, 814 F.2d 1539, 1545 (11th Cir. 1987). The court finds that Defendant's actions on and after October 27, 2010, evidenced his abandonment of any legitimate Fourth Amendment protected interest in room 227.

The question of abandonment is one of intent "which can be inferred from words, acts and other objective facts." Id. at 1546; see also United States v. Cofield, 272 F.3d 1303, 1306 (11th Cir. 2001).  "[T]he critical inquiry is 'whether the person prejudiced by the search . . . voluntarily discarded, left behind, or otherwise *relinquished his interest in the property* in question so that he could no longer retain a reasonable expectation of privacy with regard to it *at the time of the search*.'"

14

McKennon, 814 F.2d at 1546 (quoting United States v. Pirolli, 673 F.2d 1200, 1204 (11th Cir. 1982)) (emphasis in original).  In making this determination, "events that occurred after the abandonment may be considered by the court as evidence of the defendant's intent to abandon the property at the previous time."  United States v. Winchester, 916 F.2d 601, 604 (11th Cir. 1990); accord United States v. Walker, 199 Fed. Appx. 884, 886 (11th Cir. 2006) (same).  The abandonment cannot be the result of unlawful government conduct.  See United States v. Jones, 619 F.2d 494 (5th Cir. 1980).  As noted, the defendant has the burden of establishing a legitimate expectation of privacy; however, the Government has the burden of proving abandonment. Walker, 199 Fed. Appx. at 886 (citing Ramos, 12 F.3d at 1023).

In late October 2010, when Defendant Timothy Stephens and Jones left Virginia and the Stay Bridge Suites, there is no evidence before the court that either man intended to return to that hotel, that either left any belongings in the hotel, or that they made any arrangements to continue the rental of the hotel room.  (Tr. at 28-30, 87-88). On the date of the entry into the room and the search, October 28, 2010, Defendant was hundreds of miles away in Atlanta, Georgia.  (Tr. at 28, 70-72).  And, significantly, when he and Jones returned to Virginia, they did not go back to the Stay Bridge Suites but rented a room at the Red Roof Inn and then at the Hampton Inn.  Defendant was

15

arrested some twenty miles from the Stay Bridge Suites.   (Tr. at 25, 28-30). Defendant's actions upon returning to Virginia on October 29, 2010, further indicated that he had abandoned any interest in room 227.  He only called the hotel in an effort to locate his brother, when he could not reach Troy Stephens on his cellular telephone. (Tr. at 29-30).

For these reasons, the court finds that Defendant Timothy Stephens did not have a legitimate expectation of privacy in room 227 on October 28, 2010, and he, therefore, cannot challenge either the initial entry into the room nor the subsequent search of the room when the warrant was executed.  Defendant's motion [Doc. 49] to suppress should be denied.  However, in case the District Court does not reach this conclusion, the court will address Defendant's substantive challenges to the entry and search of the room.

**b.     Consent Entry and Search**

"It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." Bashir v. Rockdale County, Ga., 445 F.3d 1323, 1327 (11th Cir. 2006) (quoting Payton v. New York, 445 U.S. 573, 586, 100 S. Ct. 1371, 1380, 63 L. Ed. 2d 639 (1980)) (internal quotation marks omitted).  "This basic principle is founded on 'the very core' of the Fourth

16

Amendment:  'the right of a man to retreat into his own home and there be free from unreasonable government intrusion.'" Id. (quoting Payton, 445 U.S. at 590, 100 S. Ct. at 1382).  The fact that the instant case involves entry into a motel room in which Defendants were, or had been, staying makes no difference in the Fourth Amendment analysis.  Ramos, 12 F.3d at 1023; Forker, 928 F.2d at 370.

"It has been long recognized that police officers, possessing neither reasonable suspicion nor probable cause, may nonetheless search [a hotel room] without a warrant so long as they first obtain the voluntary consent [for the search]." United States v. Blake, 888 F.2d 795, 798 (11th Cir. 1989) (citing Schneckloth v. Bustamonte, 93 S. Ct. 2041 (1973)).  "Whether a suspect voluntarily gave consent to a search is a question of fact to be determined by the totality of the circumstances."  Id. at 798 (citing Schneckloth, 93 S. Ct. at 2059); see also United States v. Nuyens, 17 F. Supp. 2d 1303, 1306 (M.D. Fla. 1998) ("Voluntariness of consent is a question of fact, and the Court must look to the totality of the circumstances.").  "The government bears the burden of proving both the existence of consent and that the consent was not a function of acquiescence to a claim of lawful authority but rather was given freely and voluntarily." Blake, 888 F.2d at 798 (citing United States v. Massell, 823 F.2d  1503, 1507 (11th Cir. 1987)); see also United States v. Purcell, 236 F.3d 1274, 1281 (11th Cir.

2001) ("A consensual search is constitutional if it is voluntary; if it is the product of an 'essentially free and unconstrained choice.'") (citation omitted).   Factors in assessing voluntariness include: "'voluntariness of the defendant's custodial status, the presence of coercive police procedure, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence, and, significantly, the defendant's belief that no incriminating evidence will be found.'" Blake, 888 F.2d at 798 (citations omitted); see also Purcell, 236 F.3d at 1281 (same).

However, "the government need not establish [defendant's] knowledge of the right to refuse consent 'as the *sine qua non* of effective consent.'" United States v. Zapata, 180 F.3d 1237, 1241 (11th Cir. 1999) (quoting Ohio v. Robinette, 117 S. Ct. 417, 421 (1996)).   And, contrasting the test for the waiver of "rights that protect a fair criminal trial and the rights guaranteed under the Fourth Amendment[,]" Schneckloth, 93 S. Ct. at 2055, the Supreme Court explained that, while a consent to search must be voluntary, it need not be "'an intentional relinquishment or abandonment of a known right or privilege[,]'" that is, knowing and intelligent.   Id. at 93 S. Ct. at 2055-56 (citation omitted).

18

And, as the Seventh Circuit Court of Appeals stated, "A third party with common authority over the premises [or effects] sought to be searched may provide such consent. . . .  Common authority is based upon mutual use of property by persons generally having joint access or control." United States v. Aghedo, 159 F.3d 308, 310 (7th Cir. 1998) (citations omitted); accord United States v. Fernandez, 58 F.3d 593, 597-98 (11th Cir. 1995).  As noted by the Supreme Court, "[c]ommon authority is, of course, not to be implied from the mere property interest a third party has in the property . . . but rests rather on the mutual use of the property by persons generally having joint access or control for most purposes. . . ." United States v. Matlock, 94 S. Ct. 988, 993 n.7 (1974); see also United States v. Backus, 349 F.3d 1298, 1299 (11th Cir. 2003) (same).  Furthermore, "a warrantless entry is valid when based upon the consent of a third party whom the police, at the time of entry, reasonably believed possessed common authority over the premises, even if the third party does not in fact possess such authority." Fernandez, 58 F.3d at 597; see also United States v. Brazel, 102 F.3d 1120, 1148 (11th Cir. 1997).  "As with other factual determinations bearing upon search and seizure, determination of consent to enter must be judged against an objective standard: would the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief that the consenting party had authority over

19

the premises?" <u>Illinois v. Rodriguez</u>, 110 S. Ct. 2793, 2801 (quoting <u>Terry v. Ohio</u>, 88 S. Ct. 1868, 1880 (1968)) (internal quotation marks omitted); <u>see also</u> <u>United States v. Mercer</u>, 541 F.3d 1070, 1074 (11th Cir. 2008) (same).  It is the Government's burden to establish that Defendant Troy Stephens had actual authority or apparent authority to consent to the searches.  <u>See</u> <u>Rodriguez</u>, 110 S. Ct. at 2797.

The evidence establishes Defendant Troy Stephens voluntarily consented to the agents entering room 227 for the purpose of determining if anyone else was in the room.  After Defendant exited room 227 and walked down the hallway to stand near the elevators, Agents Spiegel-Halter and Grabarczyk followed him.  (Tr. at 10, 32-33, 36-37, 54-55).  When Defendant had completed his telephone conversation and responded to his name being spoken by the agents, they identified themselves, placed him under arrest and handcuffed him.  (Tr. at 37, 55).  The agents never drew their firearms, raised their voices, or threatened Defendant.  There was no struggle or use of force to effectuate the arrest.  (Tr. at 15, 57-58).  The agents, each holding one of Defendant's arms, then escorted him back to room 227, where Agent Cosenza waited.  (Tr. at 16, 38, 58).  Agent Cosenza asked Defendant Troy Stephens if anyone else was in the room, and he responded, "No, and that we could check."  (Tr. at 16, 38, 59, 65).  The agent understood that, although the word "consent" was not used, Defendant gave

20

the agents consent to enter the room to look for other occupants.  (Tr. at 38-39).  When the agent asked if Defendant had a key, Defendant indicated that the key was in his back pocket.  (Tr. at 16, 39, 59).  Agent Grabarczyk retrieved the key card from Defendant's back pocket and handed the key to Agent Cosenza, who used it to open the door to room 227.  (Tr. at 16, 59).  During the time of this conversation, the agents did not have their weapons drawn, did not threaten Defendant nor make him any promises and did not raise their voices.  No physical force was used by the agents.  (Tr. at 14-15, 17-18, 60).  Defendant appeared to understand the agents and appeared alert and coherent, not under the influence of either drugs or alcohol.  (Tr. at 18, 60).

And Agent Cosenza's understanding of Defendant's statement that the agents could check in the room for other persons when Defendant was asked if anyone else was in the room is reasonable, especially in light of the fact that Defendant did not object or indicate any misunderstanding when the agents subsequently asked about the location of the room key, retrieved the key when Defendant pointed it out, and used it to open the room door.  (Tr. at 16, 39, 59).  At no time did Defendant make any statements indicating that the agents could not enter the room.  (Tr. at 18, 61).  Although the agents did not specifically ask Defendant for consent to enter the room

in order to search for Defendant Timothy Stephens or anyone else, Defendant's words and actions indicated that he did consent for the agents to do so.[7]

In United States v. Walker, 2007 WL 1341111 (N.D. Ga. May 1, 2007), District Judge Thrash adopted the report and recommendation of Magistrate Judge Vineyard which found a voluntary consent based on similar facts.  In that case, agents knocked on the front door of the defendant's residence, and his wife answered the door.  Id., at *6.  After the agents identified themselves and explained they were there on a drug investigation, they asked the defendant's wife if she lived there and if anyone else was in the residence.  She responded that she lived in the residence and that her husband "'was upstairs, you can speak to him.'"  Id.  The agents entered and went upstairs to speak with the defendant.  Id.  Although the defendant's wife was not specifically asked for consent to enter the residence, the court found that she "essentially invited the agents inside by telling them that her husband was upstairs and they could talk to him, and she allowed them to enter the home."  Id.  The court stated that her statements at the door along with her granting access "demonstrated implied consent for the agents to enter the residence as she yielded the right-of-way without objection and

---

[7]And, the fact that Defendant did not execute "a consent to search form does not automatically render consent to search involuntary."  See United States v. Weeks, 666 F. Supp. 2d 1354, 1377 n.33 (N.D. Ga. 2009) (citations omitted).

22

allowed them to enter the residence. . . ." <u>Id.</u>  Likewise, when asked if anyone else was in room 227, Defendant responded, no, and told the agents that they could check.  This comment, along with Defendant pointing out the location of the room key and not objecting to its use to open the room door, demonstrated his implied consent for the agents to enter the room.  <u>See, e.g.</u>, <u>United States v. McCoy</u>, 407 Fed. Appx. 514, 515-16 (2nd Cir. 2010) (the court found that the defendant voluntarily consented to a search of his residence, when he told the officers there was a gun in the house and "instructed his girlfriend to show the officers where the gun was located[,]" because the statements "provided a reasonable basis for the officers to believe that [the defendant] had given them consent to enter his house to retrieve the gun"); <u>United States v. Chrispin</u>, 181 Fed. Appx. 935, 939 (11th Cir. 2006) (the court found implied consent based on the facts that, during a consensual encounter, the officer asked the defendant if he had drugs or weapons on his person and if he could frisk him, to which the defendant did not say anything but turned around putting his hands on the officer's cruiser, and stated, "although Chrispin did not express his verbal assent to be searched, his body language - turning away from [the officer] and placing his hands on the police cruiser as if preparing to be searched - gave implied consent"); <u>United States v. Hylton</u>, 349 F.3d 781, 786 (4th Cir. 2003) (the court found that, based on the co-tenant's specific

23

information about the circumstances inside the apartment, that is, "telling them that there was a gun in the apartment that Hylton had used only a week earlier to facilitate raping her[,]" telling them that "her two children might be in the apartment[,]" and telling them the specific location of the firearm, it was reasonable for the officers to infer her consent to enter the apartment and retrieve the firearm that caused her fear and apprehension); United States v. Ramirez-Chilel, 289 F.3d 744, 752 (11th Cir. 2002) (finding implied consent to enter a residence when officers approached a residence and asked for permission to enter to speak with the residents, and although not receiving "any explicit verbal consent" to enter, the defendant backed away from the door, "yielding the right-of-way," implying consent by her body language); United States v. Banks, 2002 WL 1611642, *6 (E.D. La. July 19, 2002) (finding objectively reasonable officer's belief that a defendant, who made a statement to officers legally in motel room that he had a firearm under the mattress, consented to a search in that location for a weapon) (citing United States v. Shannon, 21 F.3d 77, 82 n.1 (5th Cir. 1994) (which held "that the defendant's identification of the exact location of the gun in the room may have led the officers to reasonably believe in good faith that defendant had consented to their entry into defendant's motel room and their seizure of defendant's weapon")).

24

For the same reason, the court finds that the agents did not exceed the scope of the consent given by Defendant Troy Stephens. Defendant appears to argue that because the agents could have determined if someone else was in the room by knocking on the door, calling the room telephone or having the manager open the door and check inside, they exceeded the scope of his consent "to check" for others in the room. [Doc. 100 at 3]. Nothing that Defendant said or did at the time of the entry alerted the agents to any such restriction on the scope of the search. See United States v. Mendez, 431 F.3d 420, 427 (5th Cir. 2005) ("It is the defendant's responsibility to limit the scope of the search if he so intends."). Based on Defendant's statement that the agents could check for anyone else in the room along with his giving up the room key, Defendant's consent extended to allowing the agents entry into the hotel room to determine if there were any other occupants. See Florida v. Jimeno, 111 S. Ct. 1801, 1803-04 (1991) ("The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness – what would the typical reasonable person have understood by the exchange between the officer and the suspect?"); Zapata, 180 F.3d at 1242 ("[w]hen an individual provides a general consent to search, without expressly limiting the terms of his consent, the search 'is constrained by the bounds of reasonableness: what a police officer could reasonably interpret the

25

consent to encompass'") (quoting United States v. Strickland, 902 F.2d 937, 941 (11th Cir. 1990)).

And Agents Cosenza and Grabarczyk did not exceed the scope of the consent given by Defendant in executing the sweep to look for other occupants of the room. As they entered, the agents called out, "FBI, you need to come out . . .", and continued to make this announcement as they walked through the room. (Tr. at 61). In the room, to the agents' right, there was a kitchenette area with an island and to their left was a table. (Tr. at 16, 20). In the main room, there was a couch and a television. (Tr. at 17). The agents stood and looked around, including behind the couch, to be sure no one was hiding. (Tr. at 20). On the island, the agents observed a baseball cap that was turned upside down and in the cap was a large amount of U.S. currency. The agents did not touch the currency. (Tr. at 21, 47, 62, 66). On the table, they observed some clear bags containing a green leafy substance which the agents, based on their training and experience, believed to be marijuana. (Tr. at 21, 62).

The agents then moved into the bedroom and bathroom area where they continued to look for any one in the room, including beside and under the bed. (Tr. at 17, 21, 61). They did not see anyone else in any of the areas in room 227. (Tr. at 17). Throughout the various parts of room 227, the agents observed numerous brand new

26

items, such as stacks of hats, clothes, movies, and x-boxes, which had apparently just been purchased. (Tr. at 62). The agents then returned to the area just inside the door to room 227. (Tr. at 17, 21-22, 61). The sweep of the room lasted less than a minute. (Tr. at 17, 61). The room was not searched any further. (Tr. at 23, 63). The agents' actions conformed to a brief sweep of the room to determine if anyone else was inside.

Finally, Defendant Troy Stephens had authority to consent to the entry of the room. On October 28, 2010, Defendant was an occupant of the room, apparently the sole occupant, and was in possession of a room key. He had been staying in the room for a couple of weeks. (Tr. at 16, 24, 29, 33, 39, 59). Defendant had common authority over the room, that is, mutual use of the hotel room as a person "generally having joint access or control." Aghedo, 159 F.3d at 310. In Kimoana, the court rejected an argument similar to that made by Defendant Timothy Stephens in this case, that is, that Defendant Troy Stephens did not have authority to consent to a search of room 227 because he was not the registered renter of the room, which the agents allegedly knew at the time. 383 F.3d at 1221. The court rejected the defendant's arguments in Kimoana finding that, although the individual consenting to the search was not the registered renter, he had stayed in the room, had possessions in the room and the key to the room and had authority to consent to entry into the room. Id. at

27

1222-23.  <u>See also</u> <u>United States v. Rodriguez</u>, 414 F.3d 837, 844 (8th Cir. 2005) (finding that person who was residing in the room, although not the registered renter, had at least common authority over the room and could give consent to search). Defendant Troy Stephens had authority to allow the agents to enter room 227.

Based on the foregoing, the court finds that Defendant Troy Stephens consented to allow and had the authority to allow the agents to enter room 227 to search for other occupants and that the agents did not exceed the scope of that consent.  Accordingly, the agents were lawfully in room 227 when they observed in plain view the large amount of U.S. currency in the baseball cap on the kitchenette island, the marijuana on the table, and the numerous recently purchased items throughout the room.  (Tr. at 20-22, 62, 66).  The plain view doctrine is one exception to the warrant requirement. <u>Horton v. California</u>, 110 S. Ct. 2301, 2306 (1990).  "An officer may seize evidence that is in plain view despite the failure to obtain a search warrant if two elements are satisfied: (1) lawful access to the object seized, and, (2) the incriminating nature of the object seized is immediately apparent."  <u>United States v. Hromada</u>, 49 F.3d 685, 690 n.11 (11th Cir. 1995) (citing <u>Horton</u>, 110 S. Ct. at 2308); <u>see also</u> <u>United States v. Simpson</u>, 259 Fed. Appx. 164, 167 (11th Cir. 2007) ("Because O'Neill's consent was voluntary and the officers' actions did not exceed the limitations of that consent, the

28

officers were entitled to rely on any evidence they observed in plain view while inside the house."). As noted, the agents were lawfully in room 227. The incriminating nature of the items was also immediately apparent. United States v. Buchanan, 70 F.3d 818, 826 (5th Cir. 1996) ("The incriminating nature of an item is 'immediately apparent' if the officers have 'probable cause' to believe that the item is either evidence of a crime or contraband.") (citing Arizona v. Hicks, 107 S. Ct. 1149, 1153 (1987)). The agents knew that over $500,000 in currency was missing as a result of the armored car robbery. (Tr. at 19). Therefore, the large amount of cash in the baseball cap and the numerous newly purchased items constituted evidence of that criminal activity. And the marijuana, a controlled substance, was clearly contraband. (Tr. at 21-22). The agents' observations of these items fell within the scope of the plain view doctrine.

### c.      Seizure of Evidence

For the reasons stated, the agents were entitled to include their observations in the affidavit for the search warrant for room 227. None of those observations were tainted by any illegal entry into the room or by the agents' sweep for other persons. Defendants' arguments that the evidence should be suppressed as fruits of an unlawful entry and search lack merit, and the motions to suppress should be denied.

### III.    Conclusion

For the foregoing reasons and cited authority, the court **RECOMMENDS** that Defendants' motions [Docs. 48 and 49] to suppress evidence be **DENIED**

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, declared Ready for Trial as to **all** Defendants.

**SO RECOMMENDED AND ORDERED** this 28th day of July, 2011.


JANET F. KING
UNITED STATES MAGISTRATE JUDGE

30